UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
CORISSA GENOVESE,

                    Plaintiff,          **NOT FOR PUBLICATION**

        -against-                       **MEMORANDUM AND ORDER**
                                        11-CV-02054(KAM)

MICHAEL ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY

                    Defendant.
-----------------------------X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. § 405(g), plaintiff Corissa

Genovese ("plaintiff"), appeals the final decision of defendant

Michael Astrue, Commissioner of Social Security ("Commissioner"

or "defendant"), which denied plaintiff's application for Social

Security Disability ("SSD") and Supplemental Security Income

("SSI") under Title II of the Social Security Act ("the Act").

Plaintiff contends that she is disabled within the meaning of

the Act due to her paranoid schizophrenia and is thus entitled

to receive the aforementioned benefits.  Presently before the

court are the parties' cross-motions for judgment on the

pleadings.  For the reasons stated below, both parties' motions

are denied and this case is remanded to the ALJ for further

proceedings consistent with this Memorandum and Order.

<u>**BACKGROUND**</u>

**I.   Plaintiff's Personal and Employment History**

Corissa Genovese ("plaintiff") was born in Queens, New York on December 18, 1977.  (ECF No. 15, Administrative Record ("Tr."), at 20, 29-30.)  She graduated from high school and attended community college for one year.  (Tr. at 20, 30, 228.) Plaintiff lives alone, but her mother lives in an apartment above her.  (*Id*. at 29.)

Approximately nine years prior to plaintiff's alleged September 2006 onset date, on two separate occasions between 1997 and 1999, plaintiff left home without telling anyone and lived on the streets with homeless people, once near Albany and once in Vermont.  (*Id*. at 39-40.)  Plaintiff testified that following one of these absences, she was involuntarily hospitalized at Long Island Jewish Hillside Hospital from October 8-28, 1997.  (*Id*. at 39; *see also id.* at 162, 176.)

Plaintiff does her own shopping, cleaning, laundry, and generally prepares her own meals, although her mother cooks her dinner every night.  (*Id*. at 38, 150-52.)  Plaintiff has no problems taking public transportation.  (*Id*. at 44-45, 151.) Plaintiff has a driver's license, but she only drives to the supermarket down the block approximately once a week.  (*Id*. at 29, 151.)  Plaintiff sleeps 10-12 hours per night, and she sometimes takes a 30-minute nap in the afternoon.  (*Id*. at 38,

49.)  On April 2, 2009, plaintiff testified that she was 5'1"
and weighed 240 pounds, and that she had gained approximately 50
pounds over the last two years due to the medication she was
taking.  (*Id.* at 42-43.)

Plaintiff reported that her hobbies include going for
walks, watching television, reading, and drawing.  (*Id.* at 46-
49, 152.)  She testified that she cannot sit through an entire
movie.  (*Id.* at 48.)  She plays pool with friends approximately
once a week and she is a member of the "Friendship Network," an
organization that arranges activities for mentally ill
individuals.  (*Id.* at 46-48.)

Prior to 2000, plaintiff worked as a cashier and as a
veterinarian's tech assistant.  (*Id.* at 34, 159.)  Plaintiff
reported that she worked in each position for three weeks to two
months, and quit each job because she thought she was being
watched very closely, and feared she would be fired for missing
work.  (*Id.* at 34-35.)

From May 2000 to September 2006, plaintiff worked as a
mail handler for the United States Postal Service (USPS).  (*Id.*
at 30, 159.)  Plaintiff handled parcels, put them in
rollingstock, and prepared the mail to be sent out.  (*Id.* at
160.)  Plaintiff reported that her job required her to stand and
walk for about six hours per day and lift 45-pound bags and
place them inside of equipment at a certain pace.  (*Id.* at 30-

32; *see also id*. at 160 (reporting that plaintiff walked for four hours, stood for one hour, sat for one hour, and frequently lifted 50 pounds).)  If the pace specified by the employer was not maintained, a warning light would turn on.  (*Id*. at 31-32.) Plaintiff testified that she never argued with or had disagreements with her supervisor or her co-workers.  (*Id*. at 32.)  She stated, however, that she was "bossy" toward her co-workers in that she explained to them what they had to do. (*Id*.)

In the period leading up to September 2006 (plaintiff's alleged onset date), plaintiff reported that she was missing work two to three days per week and the pace-warning light was being turned on "more and more."  (*Id*. at 33.) Plaintiff testified that she heard "very loud voices" and that she was unable to concentrate.  (*Id*.)  Plaintiff explained that she ultimately quit her job at the USPS because she "got nervous," she was "not really feeling well," she was "exhausted all the time" and was sleeping on the machine, and she was uncomfortable because she believed she had told her boss too much about her personal life.  (*Id*. at 33-34.)  Plaintiff testified that she had not worked since leaving the USPS in September 2006.  (*Id*. at 30.)  Her social security benefits application, however, indicates that she worked as a mail handler at the USPS until December 2006.  (*Id*. at 159.)

## II.  Plaintiff's Medical History Prior to Alleged Onset Date of September 15, 2006

### a.  Hospitalizations

Plaintiff was involuntary hospitalized at Long Island Jewish Hillside Hospital from October 8, 1997 to October 28, 1997.  (*Id.* at 39, 162, 176).  She also visited the Long Island Jewish Hillside emergency room on August 4, 2004.  (*See id.* at 162.)

On July 12, 2006, plaintiff was admitted to Flushing Hospital with psychotic symptoms and requesting detoxification from cocaine.  (*Id.* at 177, 179.)  On July 13, 2006, plaintiff was transferred to Long Island Jewish's Hillside Hospital.  (*Id.* at 177, 179.)  Upon admission, it was noted that plaintiff was "acutely psychotic and exhibiting poor reasoning and judgment." (*Id.* at 179.)  She was "often illogical and with derailment in thought process," and she reported hearing mumbling voices. (*Id.* at 183.)  She reported using cocaine and drinking three to five cans of beer every day for many years.  (*Id.*)  Plaintiff reported that she was "on all meds with many side effects" but admitted that some of the medication trials were "not good" because she had not been compliant.  (*Id.*)

Plaintiff was diagnosed with disorganized schizophrenia, obsessive compulsive disorder, polysubstance dependence, and nicotine dependence.  (*Id.* at 178-79.)  Obesity

was listed as an "active medical problem." (*Id.* at 177.)  She was assessed a Global Assessment Functioning ("GAF") score of 20 out of 100 (*id.* at 179),[1] indicating "some danger of hurting self or others, occasional failure to maintain minimal personal appearance, or a gross impairment in communication."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders-IV-TR* ("DSM IV") 32 (rev'd txt. ed. 2000).

On July 14, 2006, Dr. David Kasolo, M.S., completed a Psychiatric Rehabilitation Assessment of plaintiff.  (Tr. at 181-82, 186.)  The doctor noted that plaintiff's functional deficits were symptom management, substance abuse, and social skills, and her strengths included living alone, responsibilities for her finances, working full time, and caring for two cats.  (*Id.* at 181, 186.)  Plaintiff expressed a desire to return to work and reported no problems, and Dr. Kasolo noted that her treatment goals included preparing for a smooth transition to continue working full-time at the USPS.  (*Id.* at 181, 186.)  Dr. Kasolo also noted that he and plaintiff "discussed in length the importance of openness about illness, drug abuse, self-help groups, and Nicotine Anonymous meetings." (*Id.* at 181.)

---

[1] "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 (2d Cir. 2010).

On July 16, 2006, plaintiff expressed to hospital staff that she needed to go home to "take care of some business." (*Id.* at 178.)  She was irritable and had mild "psycho motor agitation," rapid speech, and "poor insight, judgment, and impulse control." (*Id.*)  On July 17, 2006, plaintiff was discharged from the hospital after reporting that she no longer wanted substance abuse treatment and declining to be transferred to the substance abuse unit. (*Id.* at 177.)  Plaintiff was "not suicidal, not homicidal, and no longer [met] inpatient level of care." (*Id.*)  Plaintiff agreed to follow up with Dr. Lamm, but, as described below, never did so because Dr. Lamm terminated her treatment due to plaintiff's failure to complete the rehabilitation program. (*Id.* at 177, 203.)

### b.   Treatment by Dr. Joshua Lamm, M.D. (Jan. 15, 2003 – Sept. 8, 2006)

Dr. Joshua Lamm was plaintiff's treating psychiatrist from January 15, 2003 until May 13, 2006. (*Id.* at 198–203.)  He formally terminated treatment of plaintiff on September 8, 2006. (*Id.* at 203.)  During the treatment period, Dr. Lamm saw plaintiff approximately once a month. (*See id.* at 198–203.)

On numerous occasions throughout her treatment, plaintiff told Dr. Lamm that she heard voices. (*See id.* at 198–203.)  She also experienced delusional thoughts.  On April 7, 2003, plaintiff told Dr. Lamm, "my brain believes I'm a witch."

(*Id.* at 198.)  On August 11, 2003, plaintiff reported "some hallucinations of people, bus, bombs, etc." (*Id.* at 199.)  On January 29, 2004, she reported that "blue lights help her to know the future." (*Id.* at 199.)

Plaintiff consistently reported that she had to miss work because of her symptoms.  On January 15, 2003, she reported that she "call[ed] in sick a lot and d[idn]'t know why." (*Id.* at 198.)  On August 11, 2003, Dr. Lamm noted that she was "[s]till calling into work a lot – the slightest stress seems to do this to her." (*Id.* at 198–99.)  On November 24, 2003, plaintiff told Dr. Lamm that she had "not been to work in 21 days." (*Id.* at 199.)  On March 11, 2004, she stated that she was missing 1-2 days of work per week. (*Id.* at 200.)  On November 8, 2004, she reported she had not been to work because it was "too stressful." (*Id.* at 201.)  On April 11, 2005, she reported that she was "unable to get to work 5 days a week." (*Id.*)

Plaintiff did not take her medications as prescribed by Dr. Lamm.  Dr. Lamm noted that plaintiff "always takes any dose she wants." (*Id.* at 202.)  As a review of his treatment records indicates, Dr. Lamm changed plaintiff's prescription combination more than 20 times during the course of her treatment, often at plaintiff's request, and expressed his "concern at the number of changes she demands." (*See Id.*)

Additionally, throughout her treatment with Dr. Lamm, plaintiff admitted to drug use approximately ten times. (*See id.* at 199-203.)  Plaintiff's mother also expressed to Dr. Lamm her concerns about plaintiff's drug use. (*Id.* at 202.) Plaintiff admitted smoking pot and using cocaine several times, and mentioned that she had used crystal meth on one occasion. (*Id.* at 198-203).  On September 13, 2004 Dr. Lamm noted that plaintiff was "clearly more psychotic on drugs." (*Id.* at 201.) On November 8, 2004, Dr. Lamm noted that plaintiff was clean and that she "denie[d] hearing voices since she [was] clean." (*Id.*) On December 30, 2004, however, plaintiff reported hearing voices even though she claimed to be clean and sober. (*Id.*)  Dr. Lamm ultimately terminated his treatment of plaintiff because she refused to enter drug rehabilitation. (*Id.* at 203.)

## III. Plaintiff's Medical History After Alleged Onset Date of September 15, 2006

### a.   Queens Hospital Hospitalization (April 24, 2007 – June 7, 2007)

On April 24, 2007, plaintiff was admitted to Queens Hospital Center after calling the police to complain that her mother was trying to make her take her medications. (Tr. at 208.)  Plaintiff's mother reported that plaintiff had not taken her medications in seven months. (*Id.*)  Upon admission to Queens Hospital, plaintiff was assessed as having poor insight, judgment, and impulse control. (*Id.* at 227, 294.)  She was

angry and hostile and stated that "[t]hings would be better if I kill my mother." (*Id.* at 215.)  Plaintiff was diagnosed with schizophrenia.  (*Id.* at 210.)  Plaintiff was involuntarily committed to the psychiatric unit, where she remained for six weeks.  (*Id.* at 208-09, 291.)

Throughout her hospitalization at Queens Hospital, plaintiff was monitored daily by Dr. Seth Mandel.  (*Id.* at 165, 208-27, 315-56.)  On April 27, 2007, plaintiff's motor behavior stabilized, but her thinking remained "completely disorganized." (*Id.* at 315.)  She denied paranoia, but claimed that she heard voices and saw objects that she was not supposed to see.  (*Id.*) Plaintiff's speech, perception, and cognitive function were normal.  (*Id.*)  Plaintiff admitted that she needed help, and that she had used cocaine for the past four years.  (*Id.*)  Dr. Mandel assigned plaintiff a GAF score of 30 out of 100.  (*Id.* at 318).  A GAF score of 30 indicates "behavior considerably influenced by delusion or hallucinations OR serious impairment in communication of judgment OR inability to function in almost all areas."  DSM-IV at 32 (emphasis in original).

On April 28, 2007, plaintiff was compliant with her medications, was alert and oriented, and denied auditory or visual hallucinations.  (Tr. at 320.)  Plaintiff continued to have disorganized thoughts.  (*Id.*)  On April 30, 2007, Dr. Mandel reported that plaintiff was disorganized, paranoid,

uncooperative, and appeared preoccupied with leaving the hospital because she believed the doctors were "out to get her." (*Id.* at 323.)

On May 16, 2007, three weeks into plaintiff's hospitalization, Dr. Mandel noted that plaintiff was compliant with her medications. (*Id.* at 348.) Plaintiff remained unstable, had a disorganized thought process, and had poor insight into her condition. (*Id.*) Plaintiff reported hearing voices and seeing people who were not present. (*Id.*) Plaintiff was preoccupied with discharge from the hospital. (*Id.* at 348.)

On May 18, 2007, plaintiff was cooperative and reported that she was doing well and felt better than when she first arrived. (*Id.* at 351.) Plaintiff was still preoccupied with discharge from the hospital. (*Id.*) Plaintiff was still paranoid and still claimed that she heard voices. (*Id.*) Dr. Mandel noted that plaintiff had more insight into her condition, but that her judgment remained impaired. (*Id.* at 352.)

On June 7, 2007, after six weeks in the hospital, Dr. Mandel discharged plaintiff from the hospital. (*Id.* at 209-10.) Upon discharge, plaintiff had "loosening of associations," although she was much improved from the time of her admission. (*Id.* at 210.) Plaintiff "voiced greater motivation to remain abstinent from substances," and agreed to attend outpatient treatment. (*Id.* at 209.) Plaintiff had partial insight, fair

judgment, fair impulse control, and her attention was adequate. (*Id.* at 210.)  Plaintiff's thoughts still contained ideas of reference, for example, that "cars had influence on her going to the bakery." (*Id.* at 210.)  She was assessed a GAF score of 50 (*id.*), indicating "a serious impairment in social, occupational, or school functioning," DSM-IV at 34.

### b.   Dr. Heather Gillman: Consultative Examination Report (July 16, 2007)

On July 16, 2007, Dr. Heather Gillman, a licensed psychologist, performed a consultative examination on plaintiff at the request of the SSA. (*See* Tr. at 228.)  The record is not explicit as to whether Dr. Gillman reviewed any or all of plaintiff's previous medical records.  In her psychiatric evaluation, Dr. Gillman noted that plaintiff had been hospitalized at Long Island Jewish Hillside Hospital in 2006 and Queens Hospital in 2007 for schizophrenia, that she had been treated by Dr. Lamm for five years, and that she was currently seeing a social worker, Susan Kane, and a psychiatrist, Dr. Junnun Choudhury, evidencing some familiarity with plaintiff's medical history. (*Id*. at 228.)

Plaintiff reported to Dr. Gillman that she was sleeping normally, and had no depressive, panic, or manic symptoms. (*Id*. at 228.)  Plaintiff reported that she had "some thought disorder problems related to auditory hallucinations and

paranoid ideation," and that those symptoms became more acute when she was off her medication. (*Id.*)  Plaintiff was currently compliant with her medication. (*Id.*)  She reported that she had smoked cannabis within the last few weeks, but had not used cocaine in at least two months. (*Id.* at 229.)

Dr. Gillman noted that plaintiff's hobbies included painting, reading, and walking, and that plaintiff could "cook, clean, do laundry, shower and bathe by herself, and take public transportation by herself." (*Id.* at 230.)  Dr. Gillman also reported that plaintiff was interested in going back to work at the USPS. (*Id.*)  Dr. Gillman found that plaintiff had "paranoid thought patterns," but that she was "able to speak relevantly and aid in her own interview." (*Id.* at 229.)  Dr. Gillman found that plaintiff had fair insight and judgment, "intact" attention, concentration, and memory skills, and average cognitive functioning. (*Id.* at 229-30.)

Dr. Gillman concluded that plaintiff was able to follow and understand simple and complex directions, that she could do simple and complex tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, and make appropriate decisions. (*Id.* at 230.)  Dr. Gillman noted that plaintiff "may have some difficulty relating well with others and dealing well with stress," and the doctor found that

plaintiff would "not be able to manage funds due to occasional substance abuse." (*Id.* at 230-31.)

### c. Dr. N. Shliselberg: Non-Examining Consultative Report (July 24, 2007)

On July 24, 2007, Dr. N. Shliselberg, a state agency medical consultant and psychiatrist, completed a "Psychiatric Review Technique" form and a "Mental Residual Functional Capacity Assessment" of plaintiff. (*Id.* at 232-51.)  In his "Psychiatric Review Technique," Dr. Shliselberg evaluated plaintiff for the listed impairments (the "Medical Listing") in 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.03 (schizophrenic, paranoid, and other psychotic disorders)[2] and § 12.09 (substance addiction disorders).[3] (*Id.* at 234.)

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03 relates to Schizophrenic, Paranoid and Other Psychotic Disorders, "[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning. To meet the listed impairment, a claimant must satisfy the requirements in both A and B below, or must satisfy the requirements of C below:

> A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
> 1. Delusions or hallucinations; or
> 2. Catatonic or other grossly disorganized behavior; or
> 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
>     a. Blunt affect; or
>     b. Flat affect; or
>     c. Inappropriate affect; or
>     4. Emotional withdrawal and/or isolation;
>
> AND
>
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or

For both the psychiatric and substance abuse impairments, Dr. Shliselberg found that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" that would fulfill the Medical Listings' criteria. (*Id.* at 236, 242.)  In rating plaintiff's functional limitations under Medical Listing 12.03, Dr. Shliselberg found that plaintiff had no restrictions on

---

3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.09 relates to behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  To meet the listed impairment, a claimant must show that the requirements in any of the following (A through I) are satisfied:
    A. Organic mental disorders. Evaluate under 12.02.
    B. Depressive syndrome. Evaluate under 12.04.
    C. Anxiety disorders. Evaluate under 12.06.
    D. Personality disorders. Evaluate under 12.08.
    E. Peripheral neuropathies. Evaluate under 11.14.
    F. Liver damage. Evaluate under 5.05.
    G. Gastritis. Evaluate under 5.04.
    H. Pancreatitis. Evaluate under 5.08.
    I. Seizures. Evaluate under 11.02 or 11.03.

activities of daily living, mild difficulties in maintaining social functioning, no difficulties maintaining concentration, persistence or pace, and one or two repeated episodes of deterioration, each of extended duration. (*Id*. at 244.) Dr. Shliselberg also found that plaintiff did not meet the criteria set forth in paragraph C of Medical Listing 12.03. (*Id*. at 245.)

In his "Mental Residual Functional Capacity Assessment," Dr. Shliselberg found that plaintiff had no significant limitations in her understanding, memory, concentration, persistence, or social interactions. (*Id*. at 248-49.) Dr. Shliselberg's only negative finding was that plaintiff was moderately limited in her "ability to respond appropriately to changes in the work setting." (*Id*. at 248.) Dr. Shliselberg noted that plaintiff had a significant history of substance abuse and found that she had "some paranoia but no clear cut psychosis." (*Id*. at 250.) Dr. Shliselberg concluded that plaintiff was able to remember, understand, and perform complex tasks. (*Id*.)

**c.    Dr. Vito Taverna, Cathy Joachim, and Mildred Aviles: Biopsychosocial Summary (October and November 2007)**

In October and November 2007, Dr. Vito Taverna, Ms. Cathy Joachim and Ms. Mildred Alviles, of Arbor WeCare (a vocational rehabilitation program), completed a biopsychosocial

16

intake and summary of plaintiff.  (*See id*. at 252–66.)  In response to various questions, plaintiff reported that in the past two weeks she had felt depressed or hopeless several days, had trouble sleeping nearly every day, felt tired more than half the days, and had trouble concentrating more than half the days. (*Id*. at 254.)

Plaintiff reported that she spent her days at home, and that she could wash dishes, wash clothes, sweep, mop, vacuum, watch TV, make beds, shop for groceries, cook meals, read, socialize, get dressed, bathe, and groom herself.  (*Id*. at 258.)  Plaintiff weighed 219 pounds and had a body mass index of 41.38.  (*Id*. at 260.)  Her physical examination was otherwise normal.  (*Id*. at 262–63.)  Dr. Taverna also indicated that plaintiff had a history of substance abuse, including cocaine. (*Id*. at 262.)

Dr. Taverna noted that plaintiff's strengths in obtaining employment were her successful participation in Human Resources Assistance work activities and maintenance of adequate grooming, hygiene, and housing.  (*Id*. at 259.)  Barriers to employment included emotional/psychiatric problems and lack of skills.  (*Id*.)  Dr. Taverna diagnosed plaintiff with depression, anxiety, and schizophrenia.  (*Id*. at 263.)  Dr. Taverna concluded that plaintiff could sit, stand, walk, climb, bend, kneel, reach, and grasp for 1-3 hours out of an eight-hour

workday, and that she could pull for 4-5 hours.  (*Id.* at 264.)
He also found that plaintiff could lift, carry, or push 25
pounds 6-8 times per hour.  (*Id.*)  Dr. Taverna found that
plaintiff required vocational rehabilitation, and stated that
she could participate in vocational services for 35 hours per
week.  (*Id.* at 266.)

### d.   Treatment by Dr. Junnun Choudhury and Susan Kane (March 24, 2009)

Dr. Junnun Choudhury was plaintiff's treating
psychiatrist at the time of plaintiff's hearing before the ALJ
on April 2, 2009.[4]  (*Id.* at 35.)  Plaintiff testified that she
saw Dr. Choudhury once a month, which appears substantiated by
the prescriptions issued to her by Dr. Choudhury on a monthly
basis.  (*Id.* at 35, 357.)  At the time of plaintiff's ALJ
hearing, plaintiff was also attending weekly group therapy
sessions with Susan Kane, a licensed social worker at the Queens
Hospital Center.  (*Id.* at 36-37, 46.)

A letter dated April 28, 2008 co-signed by Ms. Kane
and Dr. Choudhury, states that "[d]ue to [plaintiff's]
psychiatric illness, any stress can exacerbate her symptoms
including the stress from working, therefore she is unable to
work at this time." (*Id.* at 270.)  In a "Medical Assessment"

---

[4] It is unclear from the record when plaintiff began seeing Dr. Choudhury.
She did not testify as to when she began seeing him, but the list of
prescriptions issued to her by him indicates that he first prescribed
plaintiff medication in July 2008.  (*See* Tr. at 35, 357.)

dated on or around March 24, 2009, Dr. Choudhury found that plaintiff had poor or no ability[5] to relate to coworkers, deal with the public, interact with supervisors, deal with work stresses, or maintain attention/concentration.  (*Id.* at 359.) Dr. Choudhury also found that plaintiff had poor or no ability to: (i) understand, remember, and carry out complex job instructions, or (ii) understand, remember, and carry out detailed but not complex job instructions.  (*Id.* at 360.)  Dr. Choudhury also found that plaintiff had poor or no ability to react predictably in social situations or demonstrate reliability.  (*Id.*)  Dr. Choudhury further found that plaintiff had a fair ability to relate to coworkers, use judgment, and function independently.  (*Id.* at 359.)  He also found that plaintiff could understand, remember, and carry out simple job instructions.  (*Id.* at 360.)  Finally, Dr. Choudhury noted that plaintiff had a fair ability to maintain her personal appearance and behave in an emotionally stable manner.  (*Id.*)

A letter dated March 24, 2009, co-signed by Ms. Kane and Dr. Choudhury, stated that plaintiff has had 13 psychiatric hospitalizations since 1997.  (*Id.* at 361.)  The letter also reiterated many statements made by plaintiff at the hearing: Plaintiff said she was inappropriately bossy with co-workers, that she asked obvious questions at work; that she walked off

---

[5] A ranking of "poor or none" ability is the lowest of the four possible Occupational Adjustment ranking levels.  (*See* Tr. at 359-60.)

the job when faced with too much pressure; that while she was working at the USPS, she had consistently missed one day a week for four years; and that she could not wake up until the late morning or early afternoon.  (*Id.*)

IV.  **Procedural History**

Plaintiff proactively filed applications for disability insurance benefits and Supplemental Security Income on December 19, 2006 and December 31, 2006, respectively.  (Tr. at 11.)  She alleged an inability to work as of September 15, 2006 due to schizophrenia.  (*See id.* at 134, 136.)  On July 25, 2007, plaintiff's applications were denied.  (*Id.* at 64, 68.) Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 72-73.)

On April 2, 2009, plaintiff appeared with her attorney, Douglas Brigandi, Esq., before ALJ Jeffrey M. Jordan. (*Id.* at 23-58.)  Plaintiff testified at the hearing.  (*Id.* at 28-52.)  Donald Slive, a vocational expert, also testified at the hearing.  (*Id.* at 52-56.)  In questioning Mr. Slive, the ALJ asked him to hypothesize about the work abilities of an individual with "no exertional limitations but . . . moderate deficiencies in concentration, persistence and pace and moderate difficulties in social functioning resulting in being limited to simple, routine, unskilled and low-stress tasks involving minimal contact with her coworkers and the general public and

supervisors." (*Id.* at 53.)  Mr. Slive testified that an individual with such limitations could not perform plaintiff's past work, but that there were other jobs available in the national economy that such an individual could perform.  (Tr. at 53–54.)

On April 23, 2009, ALJ Jordan found that plaintiff was not disabled pursuant to the five-step sequential evaluation process for determining whether an individual is disabled.  (*Id.* at 8.)  Specifically, the ALJ found on step one that Plaintiff had "not engaged in substantial gainful activity since September 15, 2006, the alleged onset date." (*Id.* at 13.)  Regarding step two, the ALJ found that Plaintiff had the severe impairments of schizophrenia and substance abuse disorder.  (*Id.*)

With respect to step three, however, the ALJ concluded that plaintiff's severe impairments, individually or in combination, did not meet or medically equal Medical Listing 12.03 (schizophrenic, paranoid, and other psychotic disorders) or Medical Listing 12.09 (substance abuse disorder).  (*Id.* at 14.)  Specifically, the criteria set forth in paragraph B of Medical Listing 12.03 were not satisfied based on the following findings: (1) plaintiff had mild (not marked) restrictions in activities of daily living; (2) plaintiff had moderate (not marked) difficulties with social functioning; (3) plaintiff had moderate (not marked) difficulties with

concentration, persistence, or pace; and (4) plaintiff had experienced only one or two (not repeated) episodes of decompensation.  (*Id*. at 14-15.)  Additionally, the criteria set forth in paragraph C of Medical Listing 12.03 also were not satisfied based on the evidence in the record.  (*Id*. at 15.) The ALJ also found on step three that plaintiff had the residual functional capacity ("RFC") to perform "less than the full range of heavy work."  (*Id*. at 15, 20.)  Similarly, the ALJ found that plaintiff could perform "simple, routine, unskilled and low stress tasks involving minimal contact with co-workers, supervisors, and the general public."  (*Id*. at 15, 20.)

        At step four of the analysis, the ALJ found that although plaintiff "may be physically able to perform her past relevant work, her mental impairments render her unable to perform her past relevant work."  (*Id*. at 20.)  Regarding step five, the ALJ found that considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  (*Id*. at 21.)

        On March 10, 2011, the AlJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (*Id*. at 1-3.)  Plaintiff filed this complaint on April 27, 2011.  The parties' cross-motions

for judgment on the pleadings were fully briefed on November 9, 2011. (*See* ECF Nos. 10-16.)

## DISCUSSION

## I.  The Parties' Cross-Motions for Judgment on the Pleadings

### a.  Plaintiff's Cross-Motion

Plaintiff moves for judgment on the pleadings on a number of grounds.  Plaintiff first argues that the ALJ erred by obtaining a consultative examination by Dr. Gillman, an independent consultant, instead of re-contacting plaintiff's treating physician, as required by 20 C.F.R. §§ 404.1517, 1519. (ECF No. 13, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 3-4.)  Plaintiff also argues that the consultative examination performed by Dr. Gillman was flawed because Dr. Gillman did not have access to plaintiff's medical records, as required by 20 C.F.R. § 404.1517.  (Pl. Mem. at 4.)  Plaintiff further notes that Dr. Gillman is a psychologist rather than a psychiatrist.  (*Id.*)

Additionally, plaintiff contends that Dr. Shliselberg's reports were flawed because they overstated plaintiff's abilities.  (*Id.* at 4-5.)  According to plaintiff, the ALJ should not have relied on Dr. Shliselberg's reports

because they did not contain Dr. Shliselberg's signature or credentials. (*Id.* at 5.)

Plaintiff also argues that the ALJ failed to provide good reasons for declining to give the opinions of treating physician Dr. Choudhury and Social Worker Kane controlling weight, as required by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d). (*Id.* at 6.) Plaintiff further contends that the ALJ erred in failing to consider plaintiff's obesity as a medically determinable impairment, and by failing to consider the combined effect of plaintiff's schizophrenia and obesity. (*Id.* at 5.)

Additionally, according to plaintiff, the hypothetical that the ALJ posed to the vocational expert during the hearing was inaccurate because it "did not reflect plaintiff's severe limitations." (*Id.* at 7.) By contrast, plaintiff asserts that the hypothetical posed to the vocational expert by plaintiff's attorney was more accurate because it was based on an individual who had difficulty maintaining a specified pace in the workplace. (*Id.*)

## b. Defendant's Cross-Motion

Defendant argues in support of its own motion that the ALJ correctly found that plaintiff's mental impairments did not meet or medically equal Medical Listing 12.03 (Schizophrenia) or 12.09 (Substance Abuse Disorder). (ECF No. 11, Defendant's Memorandum of Law in Support of Defendant's Motion for Judgment

on the Pleadings ("Def. Mem.") at 24-27.)  Defendant also
contends that the ALJ was not required to obtain additional
information from plaintiff's treating physicians, because
"recontacting a treating source for a medical assessment is
unnecessary if it would not have revealed any useful information
or if the physician was unprepared to undertake such as
assessment."  (ECF No. 14, Defendant's Reply Memorandum of Law
in Further Support of Defendant's Motion for Judgment on the
Pleadings and in Opposition to Plaintiff's Cross-Motion ("Def.
Reply") at 2 (citing *Perez v. Chater,* 77 F.3d 41, 48 (2d Cir.
1996)).)

        Additionally, defendant argues that the ALJ afforded
the appropriate amount of weight to the medical opinions in the
record.  (Def. Mem. at 29-32; Def. Reply at 5.)  Specifically,
the Commissioner asserts that Consultative physician Dr.
Gillman's opinion was properly afforded significant weight, and
her RFC findings were consistent with the findings of the ALJ.
(Def. Mem. at 29.)  Defendant also contends that the assertion
that Dr. Gillman did not have access to plaintiff's medical
records is unsupported by the record.  (Def. Reply at 2-3.)  The
ALJ thus properly afforded lesser weight to the opinion of
treating physician Dr. Choudhury because his "opinions were not
supported by the objective medical evidence and other evidence
[in the] record."  (Def. Mem. at 31; Def. Reply at 5.)  The

Commissioner additionally notes Dr. Choudhury was also mistaken
about the number of times plaintiff had been hospitalized,
stating that she had been hospitalized 13 times when only three
instances are reflected in the record. (Def. Reply at 5-6.)
According to the Commissioner, Dr. Choudhury also "failed to
provide specific functional limitations or examination findings
to support his conclusion." (Def. Mem. at 31.)

Furthermore, according to the Commissioner,
plaintiff's assertion that Dr. Shliselberg's reports should not
have been relied on because they are unsigned and inaccurate
lacks merit. (Def. Reply at 3-4.) As a psychiatrist, Dr.
Shliselberg was qualified to assess plaintiff. (*Id.*) Further,
according to defendant, although Dr. Shliselberg found that
plaintiff could not perform complex tasks, this is not relevant
because the ALJ concluded that plaintiff could perform only
simple tasks. (*Id.*)

Defendant also contends that the ALJ properly found
that plaintiff's symptoms were largely the result of her
substance abuse disorder and noncompliance with prescribed
medication. (Def. Mem. at 32.) Likewise, defendant submits
that the ALJ correctly found that plaintiff's obesity was not a
severe impairment. Specifically, defendant notes that
"plaintiff never explained - let alone presented any evidence to
show - how her weight impaired her ability to work." (Def.

Reply at 4; *see also* Def. Mem. at 28.)  Further, none of the reports of plaintiff's treating physicians ever mentioned that her obesity negatively affected her.  (Def. Reply at 4.) Plaintiff listed no physical impairments in any of her application materials, and mentioned obesity as a physical impairment for the first time at the hearing before the ALJ. (Def. Mem. at 28.)

Finally, defendant asserts that the ALJ correctly found that plaintiff retained the ability to do some heavy work, although she was limited "to simple, routine, unskilled and low stress tasks involving minimal contact with co-workers, supervisors, and the general public."  (Def. Mem. at 28.) According to the Commissioner, plaintiff was capable of performing a significant number of jobs available in the national economy and the hypothetical posed to the vocational expert by the ALJ, which helped the ALJ to reach this conclusion, was accurate.  (Def. Reply at 8.)  These jobs required only that an individual stay on task for some time. (*Id.*)  Further, the individual in the hypothetical posed by the ALJ matched the ALJ's ultimate findings of plaintiff's disability.  (*Id.*)

## II.   APPLICABLE LEGAL STANDARDS

### A.   The "Special Technique" for Mental Impairments

In addition to the five-step process[6] outlined in the Regulations at 20 C.F.R. §§ 404.1520 and 416.920, the SSA "has promulgated a "special technique" for the evaluation of the severity of mental impairments, which should be applied "at the second and third steps of the five-step framework, and at each level of administrative review." *Kohler v. Astrue,* 546 F.3d 260, 266 (2d Cir. 2008) (citation omitted) (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1520a and 416.920a. Application of the additional mental impairment regulations requires:

> the reviewing authority to determine first whether the claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily

---

[6] To determine if a claimant is disabled, the Social Security Act requires the ALJ to conduct a five-step sequential analysis and make findings as to each of the following:

> (1) ... the claimant is not working, (2) that [she] has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability ... (4) that the claimant is not capable of continuing in [her] prior type of work ... [and] (5) there is [no other] type of work [that] the claimant can do.

*Burgess v. Astrue,* 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)) (citations omitted) (second alteration in original); *see also* 20 C.F.R. §§ 404.1520 and 416.920.

> living; (2) social functioning; (3)
> concentration, persistence, or pace; and (4)
> episodes of decompensation.

*Kohler,* 546 F.3d at 266 (citations omitted); *see also* 20 C.F.R.
§§ 404.1520a(b)-(c), 416.920a(b)-(c).

Under the Regulations, "if the degree of limitation in
each of the first three areas is rated 'mild' or better, and no
episodes of decompensation are identified . . . the reviewing
authority . . . will conclude that the claimant's mental
impairment is not 'severe' and will deny benefits." *Kohler,* 546
F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)).  However, if
the claimant's mental impairment or combination of impairments
is severe, "in order to determine whether the impairment meets
or is equivalent in severity to any listed mental disorder," the
reviewing authority must "first compare the relevant medical
findings [along with] the functional limitation rating to the
criteria of listed mental disorders." *Id.* (citing 20 C.F.R.
§ 404.1520a(d)(2)).  If the mental impairment is equally severe
to a listed mental disorder, the "claimant will be found to be
disabled." *Id.*  "If not, the reviewing authority [must then]
assess" the plaintiff's RFC. *Id.* (citing 20 C.F.R.
§ 404.1520a(d)(3)).

Pursuant to the ALJ's duty to develop the record, the
application of this process must be documented at the "initial
and reconsideration levels of administrative review," when "a

medical or psychological consultant . . . will complete a"
Psychiatric Review Technique Form. *Id.* (citing 20 C.F.R.
§ 404.1520a(e)(1)).

### III. The ALJ Erred By Failing to Consider Plaintiff's Stated Reasons for Noncompliance with Her Treatment and By Failing to Explain the Weight He Afforded to Plaintiff's Statements When Evaluating Plaintiff's Credibility and Disability

In addition to the arguments raised by the parties in
their respective motions (some of which warrant remand, as
discussed *infra* Section IV), the court notes that the ALJ erred
by failing to consider plaintiff's stated reasons regarding why
she failed to comply with her treatment and by failing to
explain the weight the ALJ afforded to those statements, as
required by the Commissioner. As explained below, these errors
require remand in this case.

Social Security regulations require an ALJ to consider
a claimant's subjective testimony regarding her symptoms in
determining whether she is disabled. *See* 20 C.F.R. §
404.1529(a). An ALJ should compare subjective testimony
regarding the frequency and severity of symptoms to objective
medical evidence. *Id.* § 404.1529(b). If a claimant's
subjective evidence of pain is supported by objective medical
evidence, it is entitled to "great weight." *Simmons v. United
States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal
quotation marks omitted). If a claimant's symptoms suggest a

greater severity of impairment than can be demonstrated by the objective medical evidence, however, additional factors must be considered, including daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms.  20 C.F.R. § 404.1529(c)(3).

Additionally, an ALJ is required to develop the record regarding a claimant's failure to seek treatment in order to take into account any explanations for such failure.  Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996) (hereafter "SSR 96-7p"); *Eschmann v. Astrue*, No. 09-cv-1325, 2011 WL 1870294, at *15 (E.D.N.Y. May 16, 2011).  Specifically, SSR 96-7p mandates that an ALJ

> must not draw any [credibility] inferences
> about an individual's symptoms and their
> functional effects from a failure to seek or
> pursue regular medical treatment without
> first considering any explanations that the
> individual may provide . . . that may
> explain [the] . . . failure to seek medical
> treatment . . . .  The explanations provided
> by the individual may provide insight into
> the individual's credibility.  For example .
> . . [t]he individual may not take
> prescription medication because the side
> effects are less tolerable than the
> symptoms.

SSR 96-7p, 61 Fed. Reg. at 34,487; *see also Eschmann*, 2011 WL 1870294, at *15.

Here, the ALJ found that the "medical records do not confirm the accuracy of the claimant's assertions and hearing testimony.  Instead, . . . the claimant's psychiatric symptoms appear to be largely the result of her substance use disorder and *noncompliance with prescribed treatment*."  (Tr. at 18 (emphasis added).)  Thus, it appears that the ALJ did not consider or credit plaintiff's stated reasons for her lack of compliance with taking her medication, *i.e.*, that she could not cope with the side effects, even though these reasons are set forth numerous times in the record.  For example, during the ALJ hearing, plaintiff testified that her medications caused "exhaustion" and "put [her] to sleep."  (*Id.* at 36, 50.) Likewise, plaintiff asked Dr. Lamm to change her medications dozens of times because they caused sexual side effects, weight gain, changes in mood, akethesia (restless leg syndrome), dry mouth, oversedation, and drowsiness.  (*Id.* at 198-203.)  Given that SSR 96-7p requires an ALJ to consider a claimant's stated reasons for her non-compliance with treatment, the ALJ' failure to do so in this case thus constitutes a flaw in the ALJ's disability determination and warrants remand.  *See Eschmann,* 2011 WL 1870294, at *15 (remanding so that the ALJ could "re-weigh the evidence" where the "ALJ failed to consider Plaintiff's explanation for her failure to continue using various pain medications that she tried; namely, that the side

effects were less tolerable than her symptoms"); *Green v. Astrue*, No. 06 Civ. 5568, 2007 WL 2746893, at *11 (S.D.N.Y. Sept. 17, 2007) (remanding where ALJ failed to develop evidence of reasons why claimant failed to take medication, and instructing ALJ to consider credibility guidelines in SSR 96-7p, including "the reasons for any 'non-compliance'").

Moreover, the ALJ failed to provide a thorough assessment of plaintiff's credibility regarding her statements about her symptoms and reasons for failing to comply with treatment, as required by the Commissioner's own mandate that:

> It is not sufficient [for the adjudicator] to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, *and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.*

SSR 96-7p, 60 Fed. Reg. at 34,486 (emphasis added).  Absent such findings, a remand is required.  *See, e.g.*, *Eschmann*, 2011 WL 1870294, at *15; *Schultz v. Astrue*, No. 04-CV-1369, 2008 WL 728925, at *13 (N.D.N.Y. Mar. 18, 2008).

Although the ALJ did not use the word 'credibility' when he noted that "medical records do not confirm the accuracy of the claimant's assertions and hearing testimony," his ruling that "claimant's psychiatric symptoms appear to be largely the result of her substance disorder and noncompliance with prescribed treatment" plainly turned on his determination that plaintiff's own "assertions and hearing testimony" were not credible. (*See* Tr. at 18.)  The ALJ did not, however, provide a thorough assessment of plaintiff's credibility regarding the reasons for her failure to comply with treatment nor did he explain the weight he afforded (or did not afford, in this case) to her statements.  Remand is thus required for this reason as well.  *See, e.g.*, *Eschmann,* 2011 WL 1870294, at *15; *Schultz*, 2008 WL 728925, at *13.

## IV.  The ALJ Erred by Failing to Consider the Opinion of Licensed Social Worker Susan Kane

Plaintiff argues in support of her motion that the ALJ's failure to consider the opinion of Susan Kane, her licensed social worker, warrants remand in this case.  (Pl. Mem. at 5-7.)  Defendant responds that the ALJ afforded the appropriate amount of weight to the medical opinions in the record.  (Def. Mem. at 29-31; Def. Reply at 5.)  For the reasons explained below, plaintiff is correct that the AJL's failure to

consider Susan Kane's opinion must be remedied on remand, even though she is a licensed social worker.

The threshold question is whether the Commissioner's directives to ALJs on how to weigh treating sources cover the opinions of non-physician professionals, such as licensed social workers. The Commissioner's rulings, however, plainly require ALJs to consider the opinions of non-physician medical sources, such as licensed social workers:

> In addition to evidence from "acceptable medical sources,"[7] we may use evidence from "other sources" . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to . . . *licensed clinical social workers*[.]
>
> . . .
>
> [M]edical sources . . . such as . . . *licensed clinical social workers* [] have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, SSR 06-03p, 71 Fed. Reg. 45,593, 45,595 (Aug. 9, 2006) (hereafter "SSR 06-

---

[7] "Acceptable medical sources" of evidence to establish an impairment include a plaintiff's licensed treating physicians and licensed or certified treating psychologists and psychiatrists. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

03p") (emphasis added).  SSR 06-03p further directs ALJs to use the same factors for the evaluation of the opinions of "acceptable medical sources" to evaluate the opinions of "medical sources who are not 'acceptable medical sources,'" including licensed social workers.  *Id.*; *see also* 20 C.F.R. § 404.1527(d) (Commissioner's regulations on the weighing of the medical opinions of treating sources).  Specifically, the following factors may guide an ALJ's determination of what weight to give a treating source opinion: (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability [*i.e.*, the degree of explanation given in the opinion]; (4) consistency [with the record as a whole]; (5) specialization; (6) other factors such as the treating physician's familiarity with disability programs and with the case record.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Again, these same factors guide an evaluation of the opinions of "other sources," such as licensed social workers.  *Canales v. Comm'r of Soc. Sec.,* 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p, 71 Fed. Reg. at 45,595).  The ALJ need not expressly go through each factor in his decision, so long as it is "clear from the record as a whole that the ALJ properly considered" them.  *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011).

Additionally, "[r]egardless of its source," the
Regulations require that "every medical opinion" in the
administrative record be evaluated when determining whether a
claimant is disabled under the Act.  20 C.F.R. §§ 404.1527(c),
416.927(c).  Indeed, in some circumstances, an opinion of an
"other source" with a particularly lengthy treating relationship
with the claimant may be entitled to greater weight than an
"acceptable medical source" such as a treating physician who has
had infrequent contact with the claimant.  *See, e.g.*, *Saxon v.
Astrue,* 781 F. Supp. 2d 92, 103-04 (N.D.N.Y. 2011) ("Based on
the particular facts of a case, such as length of treatment, it
may be appropriate for an ALJ to give more weight to a non-
acceptable medical source than a treating physician.") (citing
*Anderson v. Astrue,* No. 07-CV-4969, 2009 WL 2824584, at *9
(E.D.N.Y. Aug. 28, 2009)).  Thus, although an ALJ is not
"required to accord controlling weight to a [social worker's]
opinion," he is not "entitled to disregard [it] altogether."
*Harris v. Astrue,* No. 08-CV-3374, 2009 WL 8500986, at *4 n.6
(E.D.N.Y. Jan. 20, 2009).  Instead, he should use his
"discretion to determine the appropriate weight" to accord the
opinion "based on all the evidence."  *Diaz v. Shalala*, 59 F.3d
307, 314 (2d Cir. 1995).  Consequently, if an ALJ determines
that the opinion of a "licensed social worker [is] not entitled
to any weight, the ALJ . . . [must] explain that decision" or

risk remand. *See, e.g., Canales,* 698 F. Supp. 2d at 344 (remanding where ALJ disregarded social worker's opinion "simply because it was the opinion of a social worker, not on account of its content or whether it conformed with the other evidence in the record"). Moreover, "[t]he mere fact that the ALJ would not be required to give controlling weight to [a non-medical source]," such as a licensed social worker, does permit the ALJ to ignore that source when developing the record. *Harris,* 2009 WL 8500986, at *4 n.6. "To the contrary," the ALJ should review the treating social worker's records and exercise his or her "'discretion to determine the appropriate weight to accord [the non-medical] opinion based on all the evidence.'" *Id.* (quoting *Diaz*, 59 F.3d at 314).

In this case, the records of plaintiff's licensed social worker, Susan Kane, are largely missing[8] and there is no indication that the ALJ sought any additional information from Ms. Kane. Moreover, the ALJ did not acknowledge Ms. Kane or her opinion at all in the AlJ's decision aside from commenting that plaintiff testified that she "participated in group therapy." (Tr. at 18.) Given that plaintiff testified at the ALJ hearing that she was receiving group therapy from Ms. Kane once a week, the ALJ was required to develop the record regarding this

---

[8] The only documentation in the record before the ALJ regarding Ms. Kane were two letters co-signed by Dr. Choudhury and Ms. Kane. (Tr. at 270, 361.)

treatment.  (Tr. at 36.)  Such a failure to develop the record warrants remand.  *See Harris,* 2009 WL 8500986, at *4 n.6.

The ALJ was also required to weigh the opinion of Ms. Kane as presented in the two letters she signed.  If the ALJ found that Ms. Kane's opinion deserved no weight, the ALJ was required to explain this decision.  *See, e.g., Canales,* 698 F. Supp. 2d at 344 ("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision."); *Harris,* 2009 WL 8500986, at *4 n.6.  The ALJ did acknowledge these letters in his discussion of the weight accorded to Dr. Choudhury (who also signed them), but did not indicate that he considered them as the separate, or even concurring, opinion of Ms. Kane.[9]  The record thus indicates that Ms. Kane's opinion was either intentionally disregarded or never considered.  Therefore, the court finds that there was a gap in the record that the ALJ had an obligation to fill, further warranting remand.

Additionally, although the ALJ determined that lesser weight should be given to Dr. Choudhury's opinion (Tr. at 19), "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative

---

[9] Although the two letters do not clearly distinguish whether the opinions therein should be ascribed to either Dr. Choudhury or Ms. Kane, because both signatures appear together under the same text, the presence of Ms. Kane's signature at least indicates that she had the same opinion as Dr. Choudhury on the matters therein.  (*See* Tr. at 270, 361.)

record," *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)
(citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).
Accordingly, because the record before the ALJ was not complete
given the absence of records from Ms. Kane, the ALJ's
determination of the weight to be given to the various treating
physicians' opinions must be reconsidered.

On remand, the ALJ must reevaluate the complete record
before determining the appropriate weight to be given to Dr.
Choudhury and the other doctors.  Similarly, because the record
before the ALJ was not complete, the hypothetical posed to the
vocational expert must be reevaluated in light of any new
medical or vocational evidence received.  *See Calabrese v.
Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) ("An ALJ may rely
on a vocational expert's testimony regarding a hypothetical as
long as the facts of the hypothetical are based on substantial
evidence, and accurately reflect the limitations and
capabilities of the claimant involved.") (citing *Dumas v.
Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983) and *Aubeuf v.
Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

## V.  Plaintiff's Remaining Arguments Do Not Warrant Remand

Although, as just discussed, the court finds several
grounds for remand in this case, plaintiff's remaining arguments
in favor of remand are meritless.

## 1.   The ALJ's Decision Not to Address Plaintiff's Obesity Does not Warrant Remand

Plaintiff contends that the ALJ erred by failing to consider plaintiff's obesity as a medically determinable impairment and the combined effect of plaintiff's schizophrenia and obesity.  (Pl. Mem. at 5.)  In response, defendant notes that "plaintiff never explained - let alone presented any evidence to show - how her weight impaired her ability to work." (Def. Reply at 4; *see also* Def. Mem. at 28.)  Further, to the extent plaintiff's weight was noted at all, none of plaintiff's treating physicians ever reported that plaintiff's obesity negatively affected her.  (Def. Reply at 4.)  Plaintiff listed no physical impairments in any of her application materials, and only mentioned obesity as a physical impairment for the first time at the hearing before the ALJ.  (Def. Mem. at 28.)

When determining whether a claimant is disabled, an ALJ must "consider the combined effect of all of [claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to constitute a disability.  20 C.F.R. §§ 404.1523, 416.923.  This consideration should include (i) impairments the plaintiff claims to have, and (ii) impairments of which the ALJ receives evidence.  20 C.F.R. §§ 404.1512(a); *Lackner v. Astrue*, No. 09-CV-895, 2011 WL 2470496, at *5 (N.D.N.Y. May 26, 2011)

41

(remanding where "the ALJ had before him evidence of a medically determinable impairment, but erroneously failed to discuss [plaintiff's] obesity"), *adopted by* 2011 WL 2457852 (N.D.N.Y. June 20, 2011).

"Obesity is not in and of itself a disability." *Guadalupe v. Barnhart,* No. 04-CV-7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing Evaluation of Obesity, SSR 02-1p, 67 Fed. Reg. 57,859 (Sept. 12, 2002) ("SSR 02-1p")). However, SSR 02-1p provides that a listing is met "if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-1p, 67 Fed. Reg. at 57,862. Nonetheless, "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases." *Cruz v. Barnhart,* No. 04-CV-9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006). Rather, "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." *Guadalupe,* 2005 WL 2033380, at *6 (citations omitted). "When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions." *Id.*; *see also Paulino v. Astrue*, No. 08-cv-02813, 2010 WL 3001752, at *18-19 (S.D.N.Y. July 30, 2010) (holding that obesity need not be explicitly addressed by ALJ where a plaintiff's physical limitations are noted in the record); *Martin v. Astrue*, No. 05-

CV-72, 2008 WL 4186339, at *3-4 (N.D.N.Y. Sept. 9, 2008) (same),
*aff'd*, 337 F. App'x 87 (2d Cir. 2009).

In this case, plaintiff's physical abilities were
outlined in detail by several doctors.  The Biospsychosocial
Summary Report completed by Dr. Taverna stated that plaintiff
weighed 219 pounds and had a body mass index of 41.38, and was
physically able to wash dishes, wash clothes, sweep, mop,
vacuum, grocery shop, cook meals, get dressed, and bathe, among
other things.  (Tr. at 258, 260.)  Dr. Taverna also found that
plaintiff could lift, carry, or push 25 pounds six to eight
times per hour.  (*Id*. at 264.)  Additionally, the evaluation
completed by Dr. Gillman stated that plaintiff could "cook,
clean, do laundry, shower and bathe by herself, and take public
transportation by herself."  (*Id*. at 230.)

After considering the medical evidence, or lack
thereof, regarding plaintiff's physical limitations and adopting
plaintiff's physical capabilities, and as noted by Dr. Taverna
and Dr. Gillman, it was reasonable for the ALJ to determine that
plaintiff had "no exertional limitation" due to her weight or
any other physical or mental reason.  (*Id*. at 15, 17, 20.)
Hence, the ALJ impliedly factored plaintiff's obesity into his
decision by adopting the physical abilities noted by the doctors
who examined her.  *See Guadalupe,* 2005 WL 2033380, at *6 ("When
an ALJ's decision adopts the physical limitations suggested by

43

reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions."). Remand is thus unwarranted on this ground.

**2.   The ALJ Did Not Err By Relying on the Opinion of Dr. Gillman, an Independent Consultative Physician**

Plaintiff argues that the ALJ erred by obtaining a consultative examination by Dr. Gillman, an independent consultant, instead of re-contacting plaintiff's treating physician, as required by 20 C.F.R. §§ 404.1517, 1519. (Pl. Mem. at 3–4.) Plaintiff also argues that Dr. Gillman's consultative examination was flawed because Dr. Gillman did not have access to plaintiff's medical records, as required by 20 C.F.R. § 404.1517. (*Id.* at 4.) Plaintiff further notes that Dr. Gillman is a psychologist rather than a psychiatrist. (*Id.*) Defendant contends in response that Dr. Gillman's opinion was properly afforded significant weight, and her RFC findings were consistent with the findings of the ALJ. (Def. Mem. at 29-30.) According to defendant, plaintiff's assertion that Dr. Gillman did not have access to plaintiff's medical records is unsupported by the record. (Def. Reply at 2-3.)

With respect to whether Dr. Gillman's examination was flawed because she purportedly did not have access to plaintiff's medical records, there is no clear requirement under the Regulations that a consultative physician must be given the

opportunity to view a claimant's entire medical record.  The
SSA's statement that an examiner must be given "necessary
background information about [a claimant's] condition," 20
C.F.R. §§ 404.1517, 416.917, does not mandate that "the examiner
must be provided with plaintiff's medical records," as plaintiff
asserts it does.  (*See* Pl. Mem. at 4.)  Moreover, the record
readily supports the inference that Dr. Gillman did review
plaintiff's medical records.  For instance, Dr. Gillman noted in
her report that plaintiff had been hospitalized at Long Island
Jewish Hillside Hospital in 2006 and Queens Hospital in 2007 for
schizophrenia, that she had been treated by Dr. Lamm for five
years, and that she was currently seeing Ms. Kane and Dr.
Choudhury, evidencing familiarity with plaintiff's medical
history.  (Tr. at 228.)

Additionally, plaintiff's contention that Dr.
Gillman's opinion should be accorded less weight because she is
a psychologist rather than a psychiatrist is meritless.  (*See*
Pl. Mem. at 4.)  As previously discussed, the applicable
regulations state that "Acceptable medical sources" which can
provide evidence to establish an impairment include plaintiff's
licensed treating physicians and licensed or certified treating
psychologists.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).  Dr.
Gillman has earned a doctorate degree in psychology and is a
mental health professional.  (*See* Tr. at 228.)  Dr. Gillman's

report, therefore, is an acceptable medical source under the Regulations and the ALJ did not err by relying on it in his decision.

### 3. The ALJ Did Not Err By Relying on the Reports of Dr. Shliselberg, the Non-Examining Consultative Physician

Plaintiff also asserts that the ALJ erred by relying on Dr. Shliselberg's reports, which were purportedly flawed because they overstated plaintiff's abilities.[10] (Pl. Mem. at 4–5.) According to plaintiff, the ALJ also should not have relied on Dr. Shliselberg's reports because they did not contain Dr. Shliselberg's handwritten signature or credentials. (*Id.* at 5.) The report contains his typewritten name and the designation "Shliselberg MD, N., Psychiatry." (Tr. at 234.) On the other hand, the Commissioner argues that plaintiff's assertion that Dr. Shliselberg's reports should not have been relied on because they are unsigned and inaccurate lacks merit and that, as a licensed psychiatrist, Dr. Shliselberg was qualified to assess plaintiff's impairments. (Def. Reply at 3–4.)

As noted above, "acceptable medical sources" of evidence establishing an impairment include a claimant's licensed treating physicians. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a). The record plainly indicates that Dr. Shliselberg

---

[10] Plaintiff's argument that Dr. Shliselberg's opinion was "valueless" because plaintiff could not perform "complex tasks," as reported by Dr. Shliselberg, is meritless because the ALJ did not find that plaintiff could perform "complex tasks." (Pl. Mem. at 5.) Instead, the ALJ found that plaintiff was "limited to simple, routine, unskilled and low stress tasks." (Tr. at 15.)

is a certified psychiatrist, a type of physician.  He is identified as "Shliselberg MD, N., Psychiatry" on his "Psychiatric Review Technique" form, and "Shliselberg MD, N." on his "Mental Residual Functional Capacity Assessment."  (Tr. at 234, 250.)  Accordingly, Dr. Shliselberg is an acceptable medical source upon which the ALJ was entitled to rely.

Regarding the signature requirement, the Regulations provide that "[a]ll *consultative* examination reports will be personally reviewed and signed by the medical source who actually performed the examination . . . .  A rubber stamp signature of a medical source . . . is not acceptable."  20 C.F.R. §§ 404.1519n(e), 416.919n(e) (emphasis added).  Thus, the signature requirements apply only to consultative examinations.  *See Lackner,* 2011 WL 2470496, at *7.  There is simply no "similar requirement for a non-examining consultative source."  *Id*. (construing 20 C.F.R. §§ 404.1519n, 416.919n).  Because Dr. Shliselberg is a non-examining consultative source, there is no handwritten signature requirement attached to his reports.  The ALJ thus properly relied on Dr. Shliselberg's reports even though they bore only a typewritten signature.  *See id.*

### 4. The ALJ Did Not Err By Failing to Re-contact Plaintiff's Treating Physician Before Scheduling an Independent Consultative Examination

Plaintiff also argues that the ALJ erred by obtaining a consultative examination by Dr. Gillman, an independent

consultant, instead of having plaintiff's treating physician perform the consultative examination, as permitted by 20 C.F.R. §§ 404.1517, 1519. (Pl. Mem. at 3-4.) Defendant asserts that the ALJ was not required to obtain additional information from plaintiff's treating physicians, because "recontacting a treating source for a medical assessment is unnecessary if it would not have revealed any useful information or if the physician was unprepared to undertake such as assessment." (Def. Reply at 2.)

Generally, an ALJ has an "'affirmative duty to develop the administrative record.'" *Anderson*, 2009 WL 2824584, at *12 (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)). Pursuant to 20 C.F.R. §§ 404.1512(e) and 416.912(e), when the evidence received from a claimant's treating physician, psychologist, or other medical source is inadequate to determine whether the claimant is disabled, the ALJ has an obligation to seek additional information to supplement the record. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011) (collecting cases). The duty does not arise, however, where there are no obvious gaps in the administrative record, *Rosa*, 168 F.3d at 79 n.5, or where the medical record is simply inconsistent with a treating physician's opinion, *Rebull v. Massanari*, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002).

Nonetheless, the ALJ must seek additional evidence or clarification when a report from a medical source contains a conflict or ambiguity, lacks necessary information, or is not based on medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §§ 404.1512(e), 416.912(e).  In assembling a complete record, the SSA must "make every reasonable effort" to "get medical reports from [plaintiff's] medical sources."  20 C.F.R. §§ 404.1512(d), 416.912(d).  "Every reasonable effort" means making "an initial request for evidence from [plaintiff's] medical source[s]," and "one follow-up request."  20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1).

Where additional information is needed, the SSA may "purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [it] to make a determination or decision on [a plaintiff's] claim."  20 C.F.R. §§ 404.1519a(b), 416.919a(b).  The source of the consultative exam can be "a treating source or another medical source."  20 C.F.R. 416.919a(b).  Likewise, "[t]he medical source may be [the claimant's] own physician or psychologist, or another source."  20 C.F.R. §§ 404.1519g(a), 416.919g(a).

Here, the ALJ made reasonable efforts to get information from almost all of plaintiff's medical sources (with the exception of social worker Susan Kane, as previously

discussed).  The SSA successfully obtained records from Long Island Jewish Hospital (Tr. at 176-91), Dr. Lamm (*id*. at 197-204), Queens Hospital Center (*id*. at 205-27), Arbor Queens Vocational Center, (*id*. at 252-66) and Dr. Choudhury (*id*. at 358-61).  The record also indicates that the SSA attempted to obtain additional information from Dr. Maya Rao and Dr. Seth Mandel, both of whom treated plaintiff during her hospitalization at Queens Hospital.  (*Id*. at 165.)  Neither doctor responded to the SSA's initial request or to its follow-up.  (*See id*. at 165-66).  The SSA was not required to take any further action; however, the ALJ is encouraged to follow up on remand and attempt to obtain records from Dr. Rao and Dr. Mandel.  *See* 20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1).

Additionally, although plaintiff might have preferred otherwise, the ALJ was explicitly permitted under the Regulations to send plaintiff to Dr. Gillman for the consultative exam.  *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (source of the consultative exam can be "a treating source or another medical source"); 20 C.F.R. §§ 404.1519g(a), 416.919g(a) ("The medical source may be [the claimant's] own physician or psychologist, or another source.").  The ALJ did not, therefore, err by doing so and, hence, remand is not warranted on this particular ground.  The ALJ may continue to consider Dr.

Gillman's consultative examination report on remand, which is required for reasons previously explained.

## Conclusion

For the foregoing reasons, the court denies both parties' cross-motions for judgment on the pleadings, and remands this case for further proceedings consistent with this opinion.  On remand, the ALJ shall take following remedial steps:

1) Contact Susan Kane to request any information regarding plaintiff's psychological impairments;

2) Reevaluate the weight that should be assigned to the medical opinions from plaintiff's treating physicians in light of any new evidence obtained;

3) Reevaluate plaintiff's testimonial credibility in light of the reasons she gave for her noncompliance with treatment, and reevaluate plaintiff's subjective complaints of pain and functional limitations, employability, and disability in light of any newly obtained information relevant to plaintiff's claims; and

4) Reevaluate plaintiff's residual functional capacity in light of any newly obtained information relevant to plaintiff's claims.

**SO ORDERED.**

**Dated:**    Brooklyn, New York
October 17, 2012

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York